The Honorable Theresa L. Fricke

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SMART APPAREL (U.S.), INC.,

                Plaintiff,

v.

NORDSTROM, INC.,

                Defendant.

NO. 2:23-cv-01754-TLF

FIRST AMENDED COMPLAINT

JURY TRIAL DEMAND

Plaintiff Smart Apparel (U.S.), Inc. ("Smart Apparel" or "Plaintiff"), by and through its attorneys, hereby brings this First Amended Complaint against Defendant Nordstrom, Inc. ("Nordstrom" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.  This action arises out of Nordstrom's improper, bad faith and pretextual cancellation of purchase orders and other demands for merchandise to Smart Apparel for 342,081 individual pieces of merchandise – mostly comprising men's dress shirts – causing over $6.7 million of damages to Smart Apparel.

2.  Smart Apparel is a leading manufacturer of fine menswear fashion, sportswear and dress shirts for upscale brands and select retailers, including Nordstrom.  Smart Apparel's

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

production facilities are primarily located in Southeast Asia, where it assembles garments at factories which are regularly audited by independent third parties for compliance with labor and ethical standards, as required by Nordstrom.

3.      On January 13, 2023, Nordstrom informed Smart Apparel that it was canceling all orders to Smart Apparel for which the merchandise had not yet cleared customs in the United States.

4.      Nordstrom's purported cancellation applied to purchase orders and other demands for merchandise for which Smart Apparel had already procured raw materials and had begun manufacturing, and which Nordstrom had agreed to purchase from Smart Apparel for more than $6.7 million.

5.      Nordstrom purported to justify its cancellation by stating that it had "reason to believe," as provided for under the governing contracts, that Smart Apparel had breached certain representations and warranties, including representations regarding forced labor, which supposedly conferred Nordstrom with the right to cancel the orders.

6.      Nordstrom's cancellation came on the heels of a December 27, 2022 press release from U.S. Customs and Border Patrol (the "CBP Release")[1] announcing that CBP would begin detaining merchandise from three companies suspected of violating CAATSA – the "Countering America's Adversaries Through Sanctions Act" – as a result of purported use of North Korean labor in their supply chains.  One of the companies identified in the CBP Release is the ultimate corporate parent of Smart Apparel.

---

[1]      https://www.cbp.gov/newsroom/national-media-release/cbp-enforces-countering-americas-adversaries-through-sanctions.

FIRST AMENDED COMPLAINT - 2

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

7.      To the extent Nordstrom relied on the CBP Release to cancel the orders to **Smart Apparel**, such reliance was entirely pretextual and in bad faith. Smart Apparel was not named in the CBP Release, never had any merchandise detained pursuant to CAATSA or any other statutory regime, and is not now and has never appeared on any sanctions list administered by the Department of Treasury's Office of Foreign Asset Controls or any other sanctions list.

8.      Prior to canceling the $6.7 million worth of purchase orders, Nordstrom never bothered contacting Smart Apparel – its business partner of many years – to inquire about or investigate the contents of the CBP Release and whether it implicated Smart Apparel.

9.      On information and belief, and as detailed below, Nordstrom did not conduct **any** investigation whether the results of the CBP investigation implicated Smart Apparel itself, or only its ultimate corporate parent – and Nordstrom certainly did not conduct a reasonable investigation whether Smart Apparel had been implicated.

10.     Had Nordstrom conducted even a basic investigation, it would have revealed that it was more likely than not that Smart Apparel did **not** utilize forced labor or North Korean labor in its supply chain. Whereas Smart Apparel's ultimate corporate parent utilizes dozens of mills and factories in its supply chain, Smart Apparel only utilized four in connection with the orders, which makes it exceedingly unlikely that one of Smart Apparel's mills or factories had been implicated when one considers the fact that the CBP Release did not indicate the pervasiveness of the alleged forced labor issues in the supply chain of Smart Apparel's ultimate corporate parent.

11.     And, had Nordstrom conducted a full investigation, it would have confirmed that Smart Apparel had not utilized any forced or North Korean labor in its supply chain.

FIRST AMENDED COMPLAINT - 3

12. Indeed, mere days after Nordstrom purported to cancel the orders, Smart Apparel representatives flew to Nordstrom's Seattle headquarters (including one individual who flew in from Asia) to demonstrate to Nordstrom, in person, that its supply chain did not use any forced or North Korean labor. Nordstrom, however, refused to rescind its improper cancellation.

13. Moreover, Nordstrom is keenly aware – and in fact requires – that independent third parties periodically audit the garment assembly facilities used by Smart Apparel for compliance with ethical labor standards. Smart Apparel similarly engages independent third parties to audit the fabric mills that supply the garment assembly facilities, even though Nordstrom does not require audits of those facilities. The results of these audits have demonstrated – without exception – that no North Korean labor or forced labor is used anywhere in the supply chain used by Smart Apparel.

14. Further demonstrating Nordstrom's bad faith, Nordstrom's cancellation purported to extend only to orders "for which the product has not cleared customs in the destination country as of the time of this email." At the time Nordstrom informed Smart Apparel on January 13, 2023 that it was cancelling the orders, Nordstrom signaled that it still intended to accept for delivery and sell at retail hundreds of thousands of merchandise units purchased from Smart Apparel pursuant to *prior* orders at a cost of more than $6.6 million. Nordstrom did, in fact, accept this merchandise, and continues to sell it, even though Nordstrom must be aware that Smart Apparel manufactured those goods using the same exact supply chain as the merchandise for the cancelled orders.

15. In reality, Nordstrom purported to cancel the orders to save money and because it had excess inventory of men's dress shirts, which comprised a large portion of the merchandise subject to the orders it canceled. With its inventory of men's dress shirts at Smart Apparel's U.S. warehouses in the fourth quarter of 2022 higher than it had been since the Covid-19 pandemic,

FIRST AMENDED COMPLAINT - 4

Nordstrom was plainly looking for a way to avoid increasing its inventory even further.  It seized on the CBP Release to provide it with cover to achieve its illicit aims.

16.     Following Nordstrom's improper cancellation of the orders, independent third-party inspectors were deployed to every facility in the group supply chain – more than thirty (30) facilities – most of which do not touch Smart Apparel's manufacturing process for Nordstrom.  This audit conclusively demonstrated that no forced or North Korean labor was used anywhere in the supply chain.  Even presented with these results, Nordstrom still would not rescind its improper cancellations.

17.     Smart Apparel is left with no recourse but to commence this action to recover its damages as a result of Nordstrom's pretextual and bad faith cancellations.

## THE PARTIES

18.     Plaintiff Smart Apparel is a corporation organized under the laws of the State of Delaware, with a principal place of business in Hong Kong.

19.     Defendant Nordstrom, Inc. is a corporation organized under the laws of Washington State, with a principal place of business at 1617 6th Ave, Seattle, Washington, 98101.

## JURISDICTION AND VENUE

20.     After Smart Apparel commenced this action in Washington State Court, Nordstrom removed this action to federal court on the basis of diversity jurisdiction.

21.     This Court has general personal jurisdiction over Nordstrom because it is incorporated in this State and has a principal place of business in King County.

22.     Venue is proper in this District because a substantial part of the acts or omissions giving rise to this action occurred within it, Defendant resides in King County, and Defendant's purchase orders' terms and conditions designate this venue.

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1

2

**FACTUAL BACKGROUND**

**A.**    **Smart Apparel's Compliance With Ethical Labor Standards**

3

4

23.    Smart Apparel was founded in 2007 and is involved in the business of

5

manufacturing and wholesale distribution of apparel.

6

24.    As a garment manufacturer and wholesaler, Smart Apparel manufactures fabrics,

7

assembles garments and imports the finished products to the United States and other retail

8

destinations.  After the goods have cleared customs, Smart Apparel arranges for the goods to be

9

warehoused and ultimately delivered to the purchaser.

10

25.    Smart Apparel seeks to comply with the highest ethical standards in all stages of its

11

manufacturing and production process.  Smart Apparel strictly prohibits any type of forced labor

12

in its supply chain.  To maintain the integrity of the supply chain – and as required by Nordstrom

13

– Smart Apparel regularly engages independent third-party companies to audit the two garment

14

assembly facilities in Sri Lanka used by Smart Apparel to ensure compliance with ethical labor

15

practices.    These  audit  reports  include  assessments  with  respect  to  forced  labor,  wage

16

underpayment, excessive working hours, child labor, unauthorized subcontractors, and prison

17

labor, among other categories.

18

19

26.    The results of these audits are shared and discussed with Nordstrom, and Smart

20

Apparel routinely collaborates with Nordstrom on areas of improvement.

21

22

27.    Smart Apparel also engages independent third parties to audit the fabric mills in

23

Vietnam and China which supply the garment assembly facilities utilized by Smart Apparel to

24

fulfill orders from Nordstrom.  While Nordstrom does not require audits of the fabric mills

25

Nordstrom is, on information and belief, aware that such audits occur.

26

FIRST AMENDED COMPLAINT - 6

28.    None of the audits of the fabric mills or garment assembly facilities used to fulfill Nordstrom's orders has ever indicated any use of forced labor or North Korean labor at any of the inspected facilities.

29.    Beyond auditing its manufacturing facilities, Smart Apparel takes other steps to ensure compliance with ethical labor practices.  For instance, Smart Apparel does not use cotton sourced from Xinjiang, China, which is known to involve the use of forced labor in its farming.

**B.    The Order Process and Smart Apparel's Facilities**

30.    Nordstrom's orders to Smart Apparel generally fall into two categories: "hard" orders and "replenishment" orders.  Nordstrom places hard orders for merchandise for which it has a specific need.  Nordstrom places replenishment orders for merchandise that Nordstrom wants Smart Apparel to manufacture and ship to Smart Apparel's United States warehouses, where Nordstrom can retrieve it and deliver it to stores as Nordstrom's retail need arises.

31.    Nordstrom communicates its hard orders and replenishment orders to Smart Apparel by sending periodic emails with "work in progress" spreadsheets to Smart Apparel, detailing Nordstrom's requirements for styles and quantity of hard and replenishment merchandise, including price and other information.  These emails and spreadsheets function as requests that Smart Apparel begin manufacturing the merchandise and as promises that Nordstrom will purchase it.  Based on the inducement of Nordstrom's emails requesting hard and replenishment merchandise and the parties' longstanding course of conduct, Smart Apparel, at its own expense, purchases raw materials, manufactures the merchandise and ships it to its U.S. warehouses.

FIRST AMENDED COMPLAINT - 7

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

32.    In connection with both hard and replenishment orders, Nordstrom transmits electronic purchase orders to Smart Apparel.  With respect to hard orders, Nordstrom includes purchase order numbers when making its initial demand to Smart Apparel but only transmits purchase orders to Smart Apparel approximately six to nine months prior to the shipping window.  With respect to replenishment orders, when Nordstrom's retail need arises, Nordstrom issues purchase orders to Smart Apparel and arranges for pickup of the merchandise from Smart Apparel's U.S. warehouses.  The electronic purchase orders incorporate Nordstrom's terms and conditions (the "T&C").

33.    Nordstrom has consistently purchased all of the hard and replenishment merchandise it orders from Smart Apparel in this manner.

34.    All of the fabrics sourced for the cancelled orders were manufactured at two fabric mills, one located in Vietnam and one in China.  Based on the parties' longstanding relationship and the fact that Nordstrom requires Smart Apparel to register with Nordstrom each of the facilities used in connection with goods manufactured for it, Nordstrom knew that the fabrics sourced for the cancelled orders had been manufactured at those two specific locations.

35.    Prior to Nordstrom's improper cancellations, the Vietnamese facility had most recently been audited by independent third-party Bureau Veritas in April 2022 and the Chinese facility by independent third-party Elevate in November 2022.  While identifying some areas for improvement, the audit reports for these fabric mills – like each one before it – confirmed that no North Korean or forced labor was used at either facility.

36.    The manufactured fabrics for the canceled orders were then sent to two facilities in Sri Lanka for assembly into finished merchandise.  Based on the parties' longstanding relationship

FIRST AMENDED COMPLAINT - 8

and the fact that Nordstrom requires Smart Apparel to register with Nordstrom all of the facilities used in connection with goods produced and manufactured for it, Nordstrom knew that the manufactured fabrics for the cancelled orders had been assembled at those two specific locations in Sri Lanka.

37.    Prior to Nordstrom's improper cancellations, the two Sri Lanka facilities were also audited by Elevate for compliance with labor and ethical standards as required by Nordstrom, most recently on February 16, 2021 and July 5, 2021.  Consistent with the results of all previous audits, Elevate did not find any use of North Korean or forced labor at either of the Sri Lanka facilities. Nordstrom even provided positive feedback to Smart Apparel concerning its efforts to maintain ethical practices at these facilities and implement improvements where appropriate.

C.    **Nordstrom's Improper, Bad Faith Cancellation of the Subject Orders**

38.    In a January 13, 2023 email, Nordstrom informed Smart Apparel that Nordstrom was "cancelling all outstanding orders for which the product has not cleared customs in the destination country as of the time of this email."

39.    The orders cancelled by Nordstrom comprise 148,373 individual units of hard order merchandise worth approximately $3,235,009.28 million (the "Hard Orders") as well as 193,708 individual units of replenishment merchandise worth approximately $3,517,676.71 million (the "Replenishment Orders").

40.    At the time of Nordstrom's improper cancellations, Nordstrom had transmitted electronic purchase orders for approximately $1,185,303.16 of Hard Orders (the "Purchase Orders"), and had assigned purchase order numbers, but had not yet transmitted electronic purchase orders to Smart Apparel, for approximately $2,049,706.12 of Hard Orders (the

FIRST AMENDED COMPLAINT - 9

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1

2

"Demanded Hard Orders," and together with the Purchase Orders and Replenishment Orders, the "Subject Orders" or "Orders").

3

4

41.    Most of the merchandise Nordstrom contracted to purchase pursuant to the Subject Orders were men's dress shirts.

5

6

7

8

42.    Nordstrom purported to justify its cancellation by stating it had "compelling reasons to believe that the manufacture of Smart Apparel products has involved violations of our Purchase Order Terms and Conditions, including the provisions regarding forced labor."

9

10

11

12

13

14

43.    In particular, although not stated expressly in its January 13, 2023 email, Nordstrom purports to have predicated its cancellation on the CBP Release, claiming the CBP Release conferred it with "reason to believe" under Paragraph 4 of the T&C that the "Merchandise … is not as represented or warranted" and/or that the "Shipments … are not in compliance with the provisions of the applicable Vendor Purchasing Guide."

15

16

44.    However, as detailed below, Nordstrom could have had no such good faith belief, and its reliance on the CBP Release is not only baseless, but pretextual and in bad faith.

17

18

19

20

21

22

23

24

45.    Indeed, notwithstanding its longstanding relationship with Smart Apparel, Nordstrom, on information and belief, never even bothered to conduct an investigation whether violations existed under the T&C which would have permitted it to cancel the Subject Orders. That Nordstrom did not conduct any investigation – much less a reasonable investigation – is confirmed by Nordstrom's purported cancellation of the Subject Orders without ever even inquiring with Smart Apparel regarding the CBP Release or, more importantly, whether the (inaccurate) information in the CBP Release also pertained to or implicated *Smart Apparel*.

25

26

46.    The reason for Nordstrom's failure to conduct even a rudimentary investigation is

FIRST AMENDED COMPLAINT - 10

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

obvious: it canceled the Subject Orders in bad faith because it no longer had a need for the merchandise and wanted an excuse to save money.[2]

**D.**     **The CBP Release**

47.     On December 27, 2022, CBP issued the CBP Release in which it stated that it supposedly had "beg[un] detaining merchandise produced or manufactured by," among other companies, Zhejiang Sunrise Garment Group Co. Ltd. ("Sunrise"), Smart Apparel's ultimate corporate parent.[3]

48.     The CBP Release states "[t]his enforcement action is the result of a CBP investigation indicating that [Sunrise] use[s] North Korean labor in [its] supply chains in violation of [CAATSA]."

49.     The CBP Release also states that, "[p]ursuant to CAATSA, CBP will detain merchandise from [Sunrise] at all U.S. ports of entry unless there is clear and convincing evidence that forced labor was not present at any stage of the production process."

50.     To date, and notwithstanding the statement in the CBP Release, CBP has <u>not</u> detained pursuant to the CBP Release a single piece of merchandise produced or manufactured by Sunrise, much less any merchandise produced or manufactured by Smart Apparel ***in connection with*** the Subject Orders or otherwise.

51.     Each of the four facilities in the supply chain used by Smart Apparel is located outside North Korea and, as demonstrated by the aforementioned audits, none employs any foreign labor.

---

[2] The T&C are annexed hereto as **Exhibit A**.

[3] The full name of Sunrise has since changed.

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

52.    Further, as detailed below, while Sunrise was identified in the CBP Release, that does not render Sunrise (much less Smart Apparel) sanctioned under U.S. law.

**E.    The CBP Release Did Not Provide Nordstrom With "Reason To Believe" That Any Violations Existed Under The Terms And Conditions That Would Have Entitled Nordstrom To Cancel The Subject Orders; Nordstrom Canceled In Bad Faith**

    **i.    Paragraph 7(b) Of The Terms And Conditions**

53.    To the extent Nordstrom contends the CBP Release established the breach of a representation and warranty under Paragraph 7(b) of the T&C – or even that the CBP Release conferred it with "reason to believe" that such a breach existed – such contention would be baseless.

54.    As an initial matter, Paragraph 7(b) is ***not*** a representation and warranty by Smart Apparel ***regarding*** any specific "Merchandise" or "Shipments" that were subject to the Orders, which means that the "reason to believe" language found in Paragraph 4 of the T&C does not apply to Paragraph 7(b).  Thus, even if it had "reason to believe" that Smart Apparel breached a representation and warranty in Paragraph 7(b), Nordstrom still could not cancel the Subject Orders.[4]

55.    In any event, Smart Apparel did not breach any representation and warranty in Paragraph 7(b) of the T&C, and the CBP Release did not confer Nordstrom with "reason to believe" that such a breach existed.

56.    The CBP Release only pertains to Sunrise, not Smart Apparel; as such, it does not state, much less suggest, that Smart Apparel "through its ***own*** operation or its supply chain" used involuntary labor.

---

[4] Nor could Nordstrom cancel the Subject Orders if Smart Apparel actually breached a representation and warranty in Paragraph 7(b).  Instead, such hypothetical breach would confer Nordstrom with only a claim for damages.

FIRST AMENDED COMPLAINT - 12

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

57. Instead, Nordstrom appears to have *speculated* that simply because CBP's "investigation" supposedly "indicated" that Sunrise "use[d] North Korean labor" in some unidentified portion of its supply chain, Smart Apparel also must have used North Korean labor.

58. That inference, made by Nordstrom without conducting an adequate (or any) independent investigation, is not remotely reasonable but, instead, based on rank conjecture, which underscores Nordstrom's bad faith.

59. Significantly, the CBP Release does not indicate *where* in Sunrise's supply chain CBP's "investigation" supposedly "indicated" that Sunrise "use[d] North Korean labor."

60. For all Nordstrom knew, it could have been a single isolated factory that had no connection to and nothing to do with the merchandise sold by Smart Apparel to Nordstrom. Nordstrom did not know and did not care to ask – the paradigm of bad faith.

61. While Nordstrom may not have cared to investigate which *Sunrise* factories or mills supposedly utilized North Korean labor, the CBP Release certainly did not provide it with "reason to believe" that any portion of *Smart Apparel's* supply chain had been implicated.

62. Given the absence of information in the CBP Release regarding the pervasiveness or location of the alleged North Korean labor in Sunrise's supply chain, and given that Sunrise utilizes <u>dozens</u> of other mills and factories in its supply chain that have nothing to do with Smart Apparel (a fact either known to Nordstrom or which it easily could have discovered), a basic investigation by Nordstrom would have revealed that it was more likely than not that Smart Apparel did *not* utilize forced labor or North Korean labor in the supply chain used to fulfill Nordstrom's orders. And, had Nordstrom conducted a full investigation, it would have confirmed

FIRST AMENDED COMPLAINT - 13

1  as much, consistent with the prior and subsequent audits that Smart Apparel shared with

2  Nordstrom.

3         **ii.**      **Paragraph 8 Of The Terms And Conditions**

4        63.    To the extent Nordstrom claims the CBP Release conferred it with "reason to

5  believe" that Smart Apparel or a company "working on [its] behalf" had dealings with North Korea

6

7  "*in connection with*" the Subject Orders, such claim is specious.

8        64.    *First*, Smart Apparel is not a "Sanctioned Person" within the meaning of the T&C,

9  which is evident from the face of the CBP Release, and which also could have been confirmed by

10  Nordstrom through a rudimentary investigation of public records.

11        65.    *Second*, even assuming Sunrise is a "Sanctioned Person" within the meaning of the

12  T&C (and it is not, as detailed below), and even assuming Sunrise itself had "dealings" with North

13

14  Korea (it did not), the CBP Release does not state – or even remotely suggest – that Sunrise (or

15  Smart Apparel) had any "dealings" with North Korea *in connection with the Subject Orders*.

16        66.    While Smart Apparel used only four facilities in connection with the Subject Orders

17  (one in Vietnam, one in China and two in Sri Lanka), Sunrise utilizes <u>dozens</u> of mills and factories

18  in its supply chain throughout East Asia, and the CBP Release does not indicate where in Sunrise's

19

20  supply chain CBP's "investigation" supposedly "indicated" that Sunrise "use[d] North Korean

21  labor."

22        67.    Thus, the CBP Release did not provide "reason to believe" that any portion of

23  *Smart Apparel's* supply chain had been implicated at all, much less that it had been implicated "*in*

24  *connection with*" the Subject Orders.

25

26

FIRST AMENDED COMPLAINT - 14

68.    Nor can Nordstrom cancel the Subject Orders by citing the separate language in Paragraph 8 of the T&C by which Smart Apparel "warrant[ed] and certifie[d]" that "no Sanctioned Person has any interest of any nature whatsoever in [Smart Apparel]."

69.    Like Paragraph 7(b), that is *not* a representation and warranty by Smart Apparel *regarding* any specific "Merchandise" or "Shipments" that were subject to the Orders, which precludes Nordstrom from invoking the "reason to believe" language found in Paragraph 4 of the T&C.

70.    Yet, even if the "reason to believe" language applies, the CBP Release did not confer Nordstrom with "reason to believe" that Sunrise was a "Sanctioned Person" which had an "interest" in Smart Apparel.

71.    Consistent with publicly available verifiable information, neither Sunrise, Smart Apparel, nor any entity in their supply chain was identified as sanctioned or otherwise blocked on any United States government restricted party list including the Specially Designated Nationals and Blocked Persons ("SDN") List, Entity List, Sectoral Sanctions Identifications ("SSI") List, or any other sanctions list administered by the Department of Treasury's Office of Foreign Asset Controls ("OFAC") or U.S. Department of Commerce. The CBP Release does not indicate or even suggest otherwise, and the CBP Release certainly did not confer Nordstrom with "reason to believe" otherwise.

72.    Moreover, the CBP Release did not indicate (nor give Nordstrom reason to believe) that Sunrise (or Smart Apparel or any entity in its supply chain) was "subject to trade restrictions under United States law," as it does <u>not</u> indicate or suggest that Sunrise (or Smart Apparel or any entity in its supply chain) was prohibited from engaging in business transactions with other

FIRST AMENDED COMPLAINT - 15

persons, entities or governments due to violations of United States law, or that they were prohibited from importing goods into the United States.

73.    Further, as noted above, Sunrise has not had a single shipment of goods detained pursuant to the CBP Release.  More importantly, there are not and never have been any restrictions on doing business with Sunrise under United States law as a consequence of the CBP Release or the CBP "investigation" alluded to in it, and Sunrise has not been prohibited from importing goods into the United States as a consequence of the CBP Release or "investigation."

**iii.    Paragraph 9 Of The Terms And Conditions**

74.    To the extent Nordstrom contends the CBP Release conferred it with "reason to believe" that "merchandise shipped <u>under any purchase order</u>" by Smart Apparel did not comply "with all applicable" laws, such contention also would be baseless.

75.    To reiterate, as detailed above, the CBP Release pertains only to Sunrise, and it was pure speculation for Nordstrom to claim based solely on the CBP Release, without conducting any (or a reasonable) investigation, that Smart Apparel's supply chain had been implicated at all, much less in connection with the Subject Orders.

**iv.    Nordstrom Cancelled The Subject Orders In Bad Faith**

76.    At this early stage, substantial evidence exists to indicate that Nordstrom canceled the Subject Orders in bad faith and, thus, purported to exercise the discretion afforded it under Paragraph 4 of the T&C in violation of the implied covenant of good faith and fair dealing.

77.    On information and belief, substantial additional evidence of Nordstrom's bad faith will be unearthed through discovery in this action because such evidence – *e.g.*, internal

FIRST AMENDED COMPLAINT - 16

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

correspondence – is in the exclusive possession of Nordstrom and/or not otherwise available to Smart Apparel at this time.

78.    In any event, the following facts currently known to Smart Apparel indicate Nordstrom's bad faith:

(a)    As noted above, on information and belief, Nordstrom never bothered to conduct an adequate (or any) investigation into whether the CBP Release implicated Smart Apparel (or otherwise established or even suggested a violation of the T&C), neglecting even to inquire with Smart Apparel regarding the CBP Release.  Instead, Nordstrom engaged in wild guesswork and opportunistically cancelled orders worth more than $6.7 million because, on information and belief, it simply no longer wanted the merchandise and sought to save money;

(b)    As noted, most of the Subject Orders were for men's dress shirts.  On information and belief, and based on, among other things, Smart Apparel's review of internal records, Nordstrom's inventory of dress shirts was very high when it purported to cancel the Subject Orders, and it attempted to cancel the Subject Orders to reduce an excess of dress-shirt inventory, the amount of which had become particularly acute given diminished demand for dress shirts more generally following the increased acceptance of work-from-home arrangements following the Covid-19 pandemic;

(c)    At the time Nordstrom improperly cancelled the Subject Orders, Nordstrom had already accepted (or committed to accept) some 341,044 units of clothing from Smart Apparel pursuant to prior orders Nordstrom had placed with Smart Apparel ("Prior Orders").  The faulty bad faith logic – *i.e.*, speculation – that Nordstrom applied to the Subject Orders would apply equally to those Prior Orders.  In other words, accepting its contentions at face value, Nordstrom

FIRST AMENDED COMPLAINT - 17

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    has knowingly accepted and has been selling 341,044 units of merchandise that it supposedly has

2    "reason to believe" utilized North Korean labor in violation of United States law.  Had Nordstrom

3    truly held a good faith belief that Smart Apparel's supply chain was tainted by forced labor issues,

4    Nordstrom also would have stopped selling the merchandise that it purchased under the Prior

5    Orders.  That it did not do so confirms its cancellation of the Subject Orders was in bad faith;

6

7            (d)      Mere days after Nordstrom purported to cancel the Subject Orders, Smart

8    Apparel representatives flew to Seattle (including one individual who flew in from Asia) to meet

9    in person with Nordstrom and demonstrated that the supply chain used for the Subject Orders did

10   not use any forced or North Korean labor, yet Nordstrom still proceeded with its purported

11   cancellation; and

12

13           (e)      After purporting to cancel the Subject Orders, Nordstrom also ignored the

14   subsequent audit of Sunrise's entire supply chain.  Specifically, in or around April 2023, seeking

15   to alleviate Nordstrom's purported "concerns" and demonstrate that no North Korean labor or

16   forced labor had been used anywhere in Sunrise's supply chain, Elevate was engaged to audit

17   every facility in Sunrise's supply chain, including facilities not used for merchandise manufactured

18   by Smart Apparel for Nordstrom.  Elevate found no forced labor issues and no foreign migrant

19   workers at any of the audited facilities.  Yet, even when Smart Apparel shared the results of this

20   chain-wide audit, Nordstrom still refused to rescind its cancellation of the Subject Orders.

21

22

23

24

25

26

FIRST AMENDED COMPLAINT - 18

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1

2

## FIRST CAUSE OF ACTION
(Breach of Contract)

3

4

79.     Smart Apparel repeats and realleges the above allegations as if fully set forth herein.

5

80.     Each of the Purchase Orders, Demanded Hard Orders and Replenishment Orders is a binding and enforceable contract between Smart Apparel and Nordstrom, and Smart Apparel has complied in full with all its obligations under each of them.

6

7

8

81.     As pertinent here, Nordstrom could only cancel the Subject Orders if it had "reason to believe" that certain violations existed under the T&C.

9

10

82.     As an objective matter, as detailed above, Nordstrom did not have "reason to believe" that violations existed under the T&C permitting it to cancel the Subject Orders.

11

12

83.     Accordingly, Nordstrom's cancellation of the Subject Orders constitutes a breach of contract with respect to each individual Order, and Nordstrom has wrongfully rejected the merchandise manufactured by Smart Apparel pursuant to Nordstrom's demands.

13

14

15

84.     As a direct and proximate cause of the foregoing breaches with respect to the Purchase Orders, Demanded Hard Orders and Replenishment Orders, Smart Apparel has been damaged in an amount to be proven at trial, but not less than $6,752,685.99, plus pre- and post-judgment interest.

16

17

18

19

## SECOND CAUSE OF ACTION
(Breach of the implied covenant of good faith and fair dealing)

20

21

85.     Smart Apparel repeats and realleges the above allegations as if fully set forth herein.

22

86.     Each of the Purchase Orders, Demanded Hard Orders and Replenishment Orders is a binding and enforceable contract between Smart Apparel and Nordstrom, and Smart Apparel has complied in full with all its obligations under each of them.

23

24

25

26

FIRST AMENDED COMPLAINT - 19

87.     Under Washington law, an implied covenant of good faith and fair dealing exists when, *inter alia*, a contract confers one party with discretionary authority to determine whether grounds exist to terminate or cancel the contract.  In such circumstances, the implied covenant operates to limit the authority of the party retaining such discretion, so that the party retaining such discretion may only terminate or cancel the contract in good faith.

88.     Moreover, under Washington's Uniform Commercial Code (UCC), an obligation of good faith in the performance and enforcement of every contract for the sale of goods exists. The UCC defines good faith as "honesty in fact and the observance of reasonable commercial stands of fair dealing."  Parties cannot contract out of or modify this duty of good faith.

89.     The implied duty of good faith and fair dealing obligates the parties to cooperate with each other, so that each may obtain the full benefit of performance.  The duty exists to promote faithfulness to an agreed common purpose and consistency with the justified expectations of the parties.

90.     The plain language of the T&C does <u>not</u> confer Nordstrom with "sole," "absolute," "unconditional" or "unfettered" discretion to cancel the Subject Orders.  Nor do the T&C confer Nordstrom with the right to terminate the Subject Orders for "convenience."

91.     Rather, Nordstrom could only terminate the Subject Orders if it had an objective good faith "reason to believe" that certain violations existed under the T&C.

92.     As detailed above, Nordstrom did not have a good faith "reason to believe" that grounds existed to cancel the Subject Orders.

93.     Moreover, Nordstrom's cancellation of the Subject Orders was intended to and has deprived Smart Apparel of the benefits of its bargain and defied the justified expectations of Smart

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

Apparel insofar as Nordstrom canceled the Subject Orders based solely on the CBP Release without conducting an adequate (or any) investigation whether the CBP Release implicated Smart Apparel.

94.     Accordingly, Nordstrom's cancellation of the Subject Orders constitutes a breach of the obligation of good faith and fair dealing with respect to each of the Subject Orders.

95.     As a direct and proximate cause of the foregoing breaches with respect to the Purchase Orders, Demanded Hard Orders and Replenishment Orders, Smart Apparel has been damaged in an amount to be proven at trial, but not less than $6,752,685.99, plus pre- and post-judgment interest.

### THIRD CAUSE OF ACTION
(Promissory Estoppel)

96.     Smart Apparel repeats and realleges the above allegations as if fully set forth herein.

97.     Nordstrom's transmission of the Demanded Hard Orders and Replenishment Orders constitutes a promise from Nordstrom that it will purchase that merchandise.

98.     Nordstrom's longstanding course of purchasing Smart Apparel merchandise in this manner further underpins that promise, justifies Smart Apparel's reliance on it, and Nordstrom should have reasonably expected that its promise would cause Smart Apparel to incur the expense of procuring raw materials and manufacturing the merchandise.

99.     Justifiably relying on Nordstrom's promise, Smart Apparel did in fact incur expense in procuring raw materials, preparing to manufacture and manufacturing merchandise to fulfill Nordstrom's Demanded Hard Orders and Replenishment Orders, which Nordstrom has now improperly cancelled.

FIRST AMENDED COMPLAINT - 21

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

100.    Injustice can only be avoided by the enforcement of Nordstrom's promise to purchase the merchandise from Smart Apparel or otherwise compensating Smart Apparel for the costs incurred to date with respect to that merchandise.

101.    Accordingly, Smart Apparel should be compensated in an amount to be proven at trial, but not less than $5,567,382.83, plus pre- and post-judgment interest.

**FOURTH CAUSE OF ACTION**
(Breach of Contract Implied in Fact)

102.    Smart Apparel repeats and realleges the above allegations as if fully set forth herein.

103.    Once Nordstrom transmits a request or demand to Smart Apparel for a hard or replenishment order and Smart Apparel begins performing to fulfil it, a contract implied in fact arises between Nordstrom and Smart Apparel.

104.    This is because Nordstrom, upon sending its electronic purchase order or email demand, knows that it is requesting work (and the incurring of cost) from Smart Apparel, and that Smart Apparel will expect compensation therefor.

105.    Nordstrom's longstanding course of dealing with Smart Apparel in purchasing merchandise from Smart Apparel in this manner further underpins that promise and justifies Smart Apparel's reliance on it.  Nordstrom should reasonably expect that its promise would cause Smart Apparel to incur the expense of producing the merchandise demanded.

106.    Nordstrom's cancellation of the Demanded Hard Orders and Replenishment Orders constitutes breach of a contract implied in fact, which breach has proximately damaged Smart Apparel.

107.    Smart Apparel performed all of its obligations under the contract implied in fact.

FIRST AMENDED COMPLAINT - 22

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

108.    Accordingly, Smart Apparel should be compensated in an amount to be proven at trial, but not less than $5,567,382.83, plus pre- and post-judgment interest.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests the following relief:

1.    Judgment against Defendant for sums including:

(a)    The principal amount owed to Plaintiff, in an amount not less than $1,185,303.16 for the Purchase Orders, and $5,567,382.83 for the Demanded Hard Orders and Replenishment Orders;

(b)    Pre- and post-judgment interest thereon, as provided RCW 19.52.010 or otherwise as recoverable at law;

(c) An award of attorney's fees and costs incurred as a result of Defendant's breach and/or inequitable conduct as provided for in the T&C; and

2.    Such other and further relief as the Court deems fair and equitable under the circumstances.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues triable by jury, as enumerated and set forth in more detail in this Complaint.

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    DATED this 28th day of December 2023.

2
                                        **KARR TUTTLE CAMPBELL**
3

4                                       By:*/s/ J. Derek Little*
                                        J. Derek Little, WSBA #40560
5                                       701 Fifth Avenue, Suite 3300
                                        Seattle, WA 98104
6                                       Telephone:  206-223-1313
                                        Facsimile:  206-682-7100
7                                       Email:  dlittle@karrtuttle.com

8                                       **PRYOR CASHMAN LLP**

9

10                                      By: */s/ Matthew S. Barkan*
                                        Matthew S. Barkan, Esq. (admitted pro hac vice)
11                                      Andrew M. Goldsmith (admitted pro hac vice)
                                        7 Times Square
12                                      New York, New York 10036-6569
                                        Telephone:  212-421-4100
13                                      Facsimile:  212-798-6943
                                        Email: mbarkan@pryorcashman.com
14                                             agoldsmith@pryorcashman.com

15                                      *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED COMPLAINT - 24

1

**CERTIFICATE OF SERVICE**

2

I, Luci Brock, affirm and state that I am employed by Karr Tuttle Campbell in King County,

3

in the State of Washington. I am over the age of 18 and not a party to the within action. My

4

business address is: 701 Fifth Ave., Suite 3300, Seattle, WA 98101. On this day, I caused the

5

foregoing document to be filed with the Court and served on the parties listed below in the manner

6

indicated.

7   David A. Perez, Bar No. 43959           ☐   Via U.S. Mail
    Christian W. Marcelo, Bar No. 51193     ☐   Via Hand Delivery
8   Perkins Coie LLP                        ☒   Via Electronic Mail
    1201 Third Avenue, Suite 4900           ☐   Via Overnight Mail
9   Seattle, WA 98101-3099                  ☒   CM/ECF via court's website
    Telephone: 206.359.8000
10  DPerez@perkinscoie.com
    CMarcelo@perkinscoie.com
11  *Attorneys for Defendant*

12  Daisy Anne Guilyard, *pro hac vice*     ☐   Via U.S. Mail
    Perkins Coie LLP                        ☐   Via Hand Delivery
13  11452 El Camino Real                    ☒   Via Electronic Mail
    Suite 300                               ☐   Via Overnight Mail
14  San Diego, California 92130-2080        ☒   CM/ECF via court's website
    Telephone: 202-434-1613
15  aguilyard@perkinscoie.com
    *Attorneys for Defendant*

16

17

I declare under penalty of perjury under the laws of the State of Washington that the

foregoing is true and correct, to the best of my knowledge. Executed on this 28th day of December,

18

2023, at Seattle, Washington.

19

20                                          *s/Luci Brock*
                                            Luci Brock
21                                          Legal Assistant

22

23

24

25

26

FIRST AMENDED COMPLAINT - 25